18 MAY 2009

## SERVICE AGREEMENT

This Service Agreement ("Agreement") is entered into as of the 29th day of April, 2009, by and between Aon Risk Services, Inc. of Massachusetts ("ARS") and O & G Industries, Inc., a Connecticut corporation ("Client").

### Recitals

The purpose of this Agreement is to confirm our mutual understanding concerning the insurance and/or financial and risk management support services as described on Exhibit A hereto ("Services") to be provided by ARS to Client for Client's Contractor Controlled Insurance Program ("CCIP") for Kleen Energy Systems, LLC project ("Project") in Middletown, Connecticut. As part of the Project, O&G is overseeing all local, state, and federal permitting, engineering, and construction of a 620 MW Combined Cycle Electric Generating Facility. O&G responsibilities include the overview of all environmental site engineering for air, water, natural gas and electrical interconnect; the design basis configuration for all mechanical, electrical, and civil/structural engineering; the construction execution plan; cost estimate; and schedule. The Project includes two Siemens SGT6-5000F dual fuel combustion turbines, one high pressure Siemens SST-5000 steam turbine, heat recovery steam generators, cooling towers, DCS instrument and control system, and a 345 kV gas-insulated switchyard with step-up transformers. Project aggregate hard construction costs total approximately three hundred million, two hundred eighteen thousand four hundred and sixty seven dollars ($300,218,467.00) and aggregate payroll is approximately sixty two million, seven hundred thousand and five hundred forty three Dollars ($62,700,543.00).

The CCIP will include only Workers' Compensation/Employers' Liability, Commercial General Liability, and Excess Liability coverages (the "CCIP Coverages") for the Project.

The parties agree:

**A.      Service Period**

This Agreement shall be for the period beginning April 29, 2009, and ending October 29, 2011, unless otherwise terminated as provided in this Agreement ("Service Period"). ARS' obligation to render Services under this Agreement will terminate at the end of the Service Period, with the exception of CCIP claims close-out services for a period of seven (7) years following the conclusion of the Service Period.

**B.      ARS' Responsibilities**

Subject to all other terms and conditions of this Agreement, ARS shall provide to Client insurance and/or financial and risk management support Services in connection with the CCIP

for the Project as outlined in the Scope of Services attached hereto as Exhibit "A" with a goal of fulfilling the economic projections provided by ARS as reflected in Exhibit B, such Exhibits to be incorporated herein by this reference.

**C.    Client's Responsibilities**

Subject to all other terms and obligations of this Agreement, Client agrees to do the following:

1. Appoint ARS as the exclusive broker of record for the CCIP for the Project.

2. Designate a Client representative responsible for providing timely instructions, data, information, and assistance to ARS to enable ARS to fully perform its Services under this Agreement.

3. Provide documentation and support to ARS in its marketing to prospective CCIP insurers, including, but not limited to, providing all necessary underwriting information as requested by ARS, reviewing and approving the underwriting submissions and insurance marketing plan to ensure the information is accurate and complete, participating in interviews and meetings with prospective insurers, timely responding to questions from prospective insurers, and selecting the CCIP insurers.

4. Make final decisions on all matters relating to Client's insurance, the CCIP Coverages, and Project risk management and loss control needs and activities.

5. Advise ARS promptly of any changes in exposures, the Project, loss-related data, and other material issues that may affect ARS' Services, or any CCIP Coverages, or prospective CCIP Coverages.

6. Acknowledge it is Client's responsibility to take such steps as are necessary to notify directly those insurers whose coverages may apply to any circumstances, occurrences, claims, suits, demands, and losses in accordance with, and as may be required by, the terms and conditions of the policies placed for Client under this Agreement. Client may send copies of such notices to ARS as may assist ARS in carrying out services relating to claim advocacy and claim consulting as may be set forth herein.

7. Review all insurance policies procured by ARS to ensure that they are accurate as to insurance coverage terms, requirements, and policy limits, and advise ARS of any errors or desired changes to such policies.

8. Assist ARS in its administration of the CCIP by adding mutually acceptable ARS suggested CCIP contractual language and the Project insurance manual to Project bid documents and construction contracts to describe the CCIP and safety obligations of Subcontractors and sub-Subcontractors, and by enforcing these contractual provisions.

9. Review and approve the CCIP contract language, Project insurance manual, budgets, and other documents prepared by ARS for use with the CCIP.

10. Attend scheduled CCIP meetings and briefings, provide risk management information reporting requirements, and assist with the continuing administration requirements for the CCIP Coverages.

11. Pay all invoices for premiums, Fee Compensation, Commission Compensation, charges, and taxes due within thirty (30) days of the date of the invoice unless otherwise provided for in this agreement.

12. Provide ARS entry and access to the Project site(s) at all reasonable times during the Service Period of this Agreement.

**D.   Compensation**

1. <u>Fee Compensation</u>.

(a) Client shall pay to ARS a total sum of four hundred and fifty thousand Dollars ($450,000.00) ("Fee Compensation").

Fee Compensation based on the estimated aggregate payroll of sixty two million, seven hundred thousand and sixty seven dollars ($62,700,543.00) shall be payable in four (4) installments as set forth below, due upon receipt of ARS' invoice.
   1. Invoiced effective 4/29/09, due 6/15/09 in the amount of one hundred twelve thousand and five hundred dollars ($112,500.00);
   2. Invoiced and due effective 8/15/09 in the amount of one hundred twelve thousand and five hundred dollars ($112,500.00);
   3. Invoiced and due effective 10/15/09 in the amount of one hundred twelve thousand and five hundred dollars ($112,500.00); and
   4. Invoiced and due effective 12/15/09 in the amount of one hundred twelve thousand and five hundred dollars ($112,500.00).

Fee Compensation shall be subject to a minimum of 75% of the estimated aggregate payroll of sixty two million, seven hundred thousand and sixty seven dollars ($62,700,543.00), or forty seven million, twenty-five thousand, four hundred and seven dollars ($47,025,407.00). Thereafter until project completion, Fee Compensation shall be adjusted at a rate of seventy one and seventy seven hundredths cents ($0.7177) per $100 of reported payroll. This adjustment will be made after final completion of the project and the collection of all payrolls for enrolled contractors.

2. <u>Commission Compensation</u>. In addition to Fee Compensation, ARS shall be entitled to receive all commissions or other fees payable from insurance carriers, or included in

premiums paid by Client to insurance carriers, for the placement of excess/umbrella CCIP coverages, or any other non-CCIP Coverages ("Commission Compensation"). Commission Compensation shall be fully earned by ARS upon delivery of such policies. ARS will use its best efforts to negotiate primary placements for the CCIP Coverages on a net of (without) commission basis to ARS; however, Client acknowledges that this is not always possible or advisable to do. Therefore, in instances where an insurer cannot, or refuses to, quote coverage net of commission, the Fee Compensation shall be adjusted, where permitted by applicable law, by the amount of Commission Compensation paid by any such insurer to ARS. If ARS is required by law to return any commissions that were credited against the Fee Compensation, for any reason, including, but not limited to, mid-term cancellation(s), Client agrees to promptly reimburse ARS for such amount.

In connection with its insurance brokerage, agency producing, consulting and other services in placing, renewing, consulting on or servicing any insurance policy, ARS will accept only:

    a)    a specific fee to be paid by the client;

    b)    a specific percentage commission on premium to be paid by the insurer set at the time of purchase, renewal, placement or servicing of the insurance policy; or

    c)    a combination of both.

ARS will accept no such commission unless, before the binding of any such policy:

    a)    ARS fully discloses such commissions, in either dollars or percentage amounts; and

    b)    Client consents in writing.

    3.    **Interests and Costs.**  Client shall pay interest at the rate of six percent (6%) per annum for any Fee Compensation or Commission Compensation invoices not paid within thirty (30) days of receipt of invoice, until the same has been paid to ARS. Client agrees to pay reasonable legal fees and costs incurred by ARS in collecting any payments, fees, or commissions due under this Agreement.

### E.  Termination

The parties acknowledge and agree that they shall not terminate this Agreement at any time, unless such termination is the result of a material breach of this Agreement by the other party that is not cured within thirty (30) days of written notice to the breaching party.

### F.  Compensation Payable to Affiliates

GAW 042307

4

ARS shall provide to Client all marketing quotes, including any applicable commission rates received prior to binding the CCIP Coverages. ARS will also provide to Client prior to binding an accounting of any amounts to be paid to ARS, ARS' affiliates, and/or non-ARS intermediaries if available, in connection with the CCIP Coverages, including any fees, if applicable. In addition, ARS will provide to Client annually a summary of all ARS revenue received, or contemplated to be received, during the preceding year which is applicable to the CCIP.

### G. Surplus Lines or Other Premium Taxes and/or Fees

In some instances, insurance placements made by ARS on behalf of Client may require the payment of state surplus lines, or other premium taxes and/or fees, in addition to the premium itself. ARS will identify any such taxes and/or fees in advance, but in all instances the payment of these taxes and/or fees will remain the sole responsibility of Client. ARS will invoice Client for the payment of such taxes and fees, and Client shall promptly pay the same to ARS.

### H. Mutual Confidentiality Covenant

1. The Services and work product provided by ARS hereunder are provided for the exclusive use of Client. Data, recommendations, proposals, reports, and similar information and work product provided by ARS are not to be distributed to, used, or relied upon by other parties without the prior written consent of Client and ARS, except that Confidential Information may be distributed to, used, or relied upon by Client's legal, accounting and insurance financial advisors.

2. "Confidential Information" shall include each party's methods; financial analyses; marketing activities, techniques, guidelines, policies, and specifications for the administration of a Contractor Controlled Insurance Program; certain sections of ARS' proposal to Client as marked "Proprietary", AonWrap and related databases that are disclosed by ARS to Client and information, including financial information provided by the Client to ARS regarding the Project.

3. Each party agrees that, during the Service Period of this Agreement, and for two (2) years thereafter, it will:

    (a) hold all Confidential Information it receives from the other party in strict confidence, and with the same degree of care that it gives to its own proprietary and confidential information, but not less than a reasonable degree of care, and will not directly or indirectly communicate, divulge, distribute, or otherwise disclose any Confidential Information to others, except as may be required by law, and then only to the extent required by law;

GAW 042307

5

(b) not use Confidential Information commercially, or for any other purpose, except the above-stated purpose;

(c) limit the dissemination of, and access to, Confidential Information to those personnel and affiliated entities that have a need for access to such Confidential Information for the above-stated purpose, and that are under an obligation of confidence consistent with this Agreement;

(d) return to the other party, within thirty (30) calendar days of its request, or upon termination of this Agreement, that party's Confidential Information, and use reasonable efforts to destroy all copies thereof, and any other records containing Confidential Information, except that the returning party may retain one (1) copy for the sole purpose of determining its continuing obligations under this Agreement.

I.  **General Provisions**

1.  **Assignment.** Neither party shall assign this Agreement, or transfer any rights hereunder, by operation of law, or otherwise, without the prior written consent of the other party.

2.  **Audit.** ARS agrees that during the Service Period of this Agreement, and for a period of twelve (12) months after the termination or expiration hereof, Client, or its authorized representatives, shall have the right to audit financial records relating to the insurance placements by ARS under this Agreement. Any audit will be at the expense of Client.

3.  **Client's Data and Current Insurance.** ARS' Services, recommendations, evaluations, and reports are based on data furnished by Client. Client shall have the responsibility to report and communicate, in writing, to ARS changes in exposures, loss-related data, and other material changes. ARS shall be under no obligation to investigate or verify the accuracy or completeness of any such data or information. ARS shall not have any liability for any errors, deficiencies, or omissions in its Services, or with respect to Client's insurance coverages, to the extent resulting from any materially inaccurate or incomplete data or information received by ARS from Client. ARS shall assume the responsibility of reporting such changes to any insurance carriers. ARS shall have no liability under this Agreement for insurance policies, coverages, and programs that predate this Agreement.

4.  **Independent Parties.** ARS' relationship to Client, hereunder, is one of independent subcontractor, and nothing contained in this Agreement shall be construed to imply that ARS, or any ARS officer, employee, or agent is an employee or agent of Client for any purpose. ARS shall have no right, power, or authority to create any obligation, expressed or implied, or to make any representation on behalf of Client, except as may be expressly authorized from time to time by Client in writing, and then only to the extent of such authorization. Nothing herein shall imply an agency, joint venture, or partner relationship between the parties. ARS' employees assigned to perform Services hereunder shall be, and shall remain, employees of ARS whether Services are performed at ARS' facilities, or at Client's

facilities, and shall not for any purpose be considered Client's employees. ARS shall be solely responsible for the payment of salaries and all matters relating thereto, including the withholding and/or payment of all payroll taxes, workers' compensation, unemployment compensation, public liability, insurance-related benefits, vacation pay, holiday pay, and all such additional legal requirements applicable to ARS' employees.

5. <u>Intermediaries/Managing General Agents/Managing General Underwriters</u>. When in ARS' professional judgment it becomes necessary or appropriate to utilize the services of other intermediaries, including managing general agents/managing general underwriters ("MGAs/MGUs"), wholesale brokers, or reinsurance brokers (collectively, "Intermediaries") to assist in accessing, negotiating, placing, or procuring insurance or reinsurance markets for the CCIP, ARS will advise Client before approaching such Intermediaries. Such Intermediaries may or may not be affiliates of ARS. ARS will advise Client as to whether any such Intermediary is an affiliate of ARS. In the event a non-ARS affiliated Intermediary is appointed, retained, or engaged to assist in accessing, negotiating, placing, or procuring insurance or reinsurance for the CCIP, ARS will not be responsible for any such Intermediary's failure or refusal to disclose any or all compensation received, or contemplated to be received, by any such Intermediary in connection with the placements for the CCIP. Under all circumstances, any and all compensation earned by non-ARS affiliated Intermediaries in connection with the CCIP shall be in addition to the Fee Compensation paid to ARS hereunder, and to any compensation Client agrees may be earned by ARS' affiliated Intermediaries. MGAs/MGUs are typically appointed as agents or administrators of the insurance companies they represent, and they are usually compensated by such companies in the form of commissions from premiums. Wholesale brokers and reinsurance brokers are also typically compensated by insurance companies in the form of commissions. Wholesale brokers may also receive fees from underwriters for the customary services and activities they carry out. In some instances, and subject to applicable law, wholesale brokers may assess a broker's fee in addition to the compensation paid by insurance companies, and such broker's fees are typically paid by the Client.

6. <u>Loss Control and Claims Administration Services</u>. Provided that Loss Control Services are provided in a diligent and professional manner utilizing competent and experienced personnel, ARS' loss control and safety services are purely advisory in nature, and are for the sole purpose of assisting Client in Client's monitoring of Subcontractors' compliance with Project safety standards for the CCIP. ARS' risk Services and loss control and safety services are not intended to constitute a safety inspection as provided by a safety engineering service for the purpose of identifying every loss potential, statutory or code violation, or violation of good practice. Rather, ARS' services are intended to assist Client in creating a safer work site for CCIP purposes, and to assist Client in the development of risk control procedures. ARS' risk Services and loss control and safety services, surveys, and reports are based upon conditions ARS observes, and information Client and others supply during ARS' visits. ARS does not either expressly or impliedly guarantee, ensure, or warrant in any way the safety of the Project site, that Client or the Project site is in compliance with any law or regulation, or that Client will receive a specific claim payment or monetary savings as a result of ARS' advice. ARS' employees shall not be required to perform any tests, or make any inspections that such employees are not legally permitted to perform or make. Client shall include ARS as a named insured under its CCIP insurance policies for the loss control services performed by ARS. If

ARS, or one of its affiliates, prepares a loss control report regarding some or all of Client's operations, Client hereby consents and agrees that any such report may be disclosed to insurers, or prospective insurers, for the CCIP. ARS shall provide a copy of any such report at the time it is disclosed to insurers or prospective insurers.

With respect to claim administration services, ARS offers no representation or warranty, express or implied that as a result of ARS performing such services Client will receive a specific claim payment or monetary savings generally.

7. <u>Market Security</u>. ARS' goal is to procure insurance for Client with underwriters possessing the financial strength to perform in today's economic environment. ARS regularly reviews publicly available information concerning an underwriter's financial condition including, but not limited to, approvals by various regulatory authorities, analyses of underwriters by professional rating agencies such as A.M. Best, Standard and Poors, and Moody's, and the input of our global affiliates and correspondents. Most ARS placements are made with underwriters that are rated "Excellent" by the professional rating agencies; however, ARS does not guarantee the solvency of any underwriter. ARS encourages Client to review the publicly available information made available by ARS. Provided that ARS has made recommendations in accordance with the standards outlined in this paragraph, the decision to accept or reject an underwriter shall be made solely by Client. Client understands and agrees that ARS is not the insurer of any exposure, and that ARS does not guarantee the availability of any form of insurance coverage.

8. <u>No Legal Services.</u> ARS' Services are not of a legal nature, and ARS shall in no event give, be required to give, or be deemed to have given, any legal opinions, legal representation, or advice to Client.

9. <u>Notice</u>. Any notices or other communications to be given to either party under this Agreement shall be in writing. Notice under this Agreement shall be sufficient only if personally delivered by a commercial delivery service, or mailed by registered or certified mail (return receipt requested) to the other party at its address set forth below. Notices sent by mail shall be deemed received two (2) days after deposit in the United States mail.

| | |
|---|---|
| If to Client: | Mr. Kenneth Merz<br>O&G Industries, Inc.<br>112 Wall Street<br>Torrington, CT  06790 |
| If to ARS: | Mr. Mark Toglia<br>ARS, Inc. of Massachusetts<br>One Federal Street, 20th Floor<br>Boston, MA  02110 |

or to such other addresses as the parties may specify, in writing, from time to time.

10. _Premiums_. Premiums paid by Client to ARS for remittance to insurers, and Client premium refunds paid to ARS by insurance companies for remittance to Client are deposited into fiduciary accounts in accordance with applicable insurance laws until they are due to be paid to the insurance company, or to Client. ARS and Client agree that for funds on deposit in the fiduciary accounts for five (5) days or greater, ARS shall provide to the Client the interest or investment income earned while such funds are on deposit in such accounts.

11. _References_. Client hereby consents to the use of Client's logo, pictures, and other publicly available information about Client, solely for the purpose of marketing Client's CCIP.

12. _Severability._ If any provision of this Agreement is held to be in violation of any applicable law, statute, regulation, or judicial or administrative order, such provision shall be deemed to be amended to conform to such applicable law, statute, regulation, or judicial or administrative order, to the maximum extent permitted by law, and where not so permitted by law, such offending provision shall be deemed to be of no force and effect.

13. _Successors and Assigns._ This Agreement shall inure to the benefit of the successors and assigns of the parties, except that nothing contained in this Section I(13) shall be construed to permit any attempted assignment or transfer that would be in violation of any other provision of this Agreement.

14. _Compliance_. There are no third party beneficiaries to this Agreement. Client acknowledges and agrees that ARS shall not be deemed to have guaranteed, assured, or warranted on Client's behalf, or for the benefit of others:

    (a)    the safety of Client's location(s);

    (b)    that Client is in compliance with Federal, state, and local laws, statutes, ordinances, recommendations, regulations, consensus codes, or other standards; or

    (c)    that compliance with, or implementation of, ARS' recommendations will eliminate or reduce any or all hazards, accidents, or other losses.

15. _Counterparts_. This Agreement may be executed simultaneously in one (1) or more counterparts, with the same effect as if the parties executing the several counterparts had executed one (1) counterpart; provided, however, that the several executed counterparts shall together constitute one (1) and the same instrument.

16. _Entire Agreement._ This Agreement, and its exhibits, set forth the entire agreement between the parties as of the date appearing above with respect to the subject matter herein, and merges and supersedes all prior discussions, agreements, and understandings of every kind and nature between the parties, and no party shall be bound by any term or condition with respect to the subject matter, other than as expressly set forth, or provided for, in this Agreement and its exhibits. This Agreement may not be changed or modified, nor any provision waived, without the prior written consent of the parties.

17. <u>Governing Law.</u>   This Agreement shall be governed by, and construed in accordance with, the laws where the Project is located.

18. <u>Headings.</u>   The headings of the various sections of this Agreement are inserted for convenience only, and are not intended to affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first written above.

O&G Industries, Inc., a Connecticut corporation

By: _____
Kenneth Merz
Its:   Secretary

Aon Risk Services, Inc. of Massachusetts

By: _____
Mark A. Toglia
Senior Vice President

# EXHIBIT "A"

## Scope of Services

This Exhibit A covers only those services to be performed by ARS during the Service Period. Compensation for additional services required by Client, and compensation for services to be performed after the end of the Service Period, shall be separately negotiated.

1. ARS will develop, recommend, negotiate, and place insurance and/or risk financing programs for all CCIP Coverages.

2. ARS will request underwriting information from Client, and ARS will prepare the underwriting information and insurance applications for presentation and submission to qualified insurance markets. ARS will not assume responsibility for the accuracy and completeness of Client's underwriting information, and ARS shall be entitled to rely on information provided by Client and its employees. Client shall sign those applications requiring signature.

3. Upon Client's authorization, market to, and negotiate the terms and conditions of, the CCIP Coverages with prospective CCIP insurers, and take such steps as ARS deems appropriate to implement the CCIP Coverages with the assistance of Client.

4. ARS will administer Client's relationship with insurance companies including, but not limited to, issues such as billings in connection with selected programs, data reporting, other than claim data, and compliance with negotiated requirements.

5. ARS will review the CCIP insurance policies placed by ARS to ensure that they are accurate as to the insurance coverage terms and policy limits that Client is purchasing, and will advise Client of any errors or required changes to such policies. ARS will cause the CCIP Insurers to provide to Client full and complete copies of all of the CCIP insurance policies .

6. Review Client's template Project subcontractor agreements, and provide to Client sample CCIP insurance contract provisions for review by Client's legal counsel.

7. Prepare, with Client's provision of Client's contact information, a CCIP insurance manual describing the CCIP Coverages, administration, and claims procedures, for review by Client's legal counsel.

8. Conduct CCIP orientation and training sessions for Client's Project team and subcontractors.

9. Client will assist ARS in its administration of the CCIP. ARS will conduct the following tasks, with the Client assistance:

    (a) ARS will provide the Client with a subcontract addendum to effect the CCIP and provide the CCIP insurance manual, both to be approved by Client's legal counsel;

GAW 042307

11

(b) Client will convey the contractual amendment that effects the CCIP along with a copy of the CCIP insurance manual to all subcontractors working on the Project;

(c) Client will provide ARS with a list of all subcontractors who receive the contractual amendment and confirm when it is signed by the subcontractor;

(d) ARS will communicate to Client appropriate CCIP credit deductions to be withheld from each Project subcontractor and sub-subcontractor;

(e) ARS will enroll eligible Project subcontractors and sub-subcontractors;

(f) ARS will process and distribute CCIP certificates of coverage;

(g) ARS will collect and review insurance certificates for each enrolled Project subcontractor for non-CCIP insurance coverages to verify compliance with the Project insurance requirements;

(h) Client will identify an individual on the Project who will work with ARS to:
    i. identify any new subcontractor or subcontractors who will be coming to the site; and
    ii. report any incidents/claims that occur on site that may be covered by the CCIP or from any enrolled subcontractor to the CCIP insurance carriers with copies to ARS.

(i) ARS will analyze CCIP insurers' loss reserves, and negotiate appropriate changes; and

(j) Client will support ARS to resolve CCIP issues with Project subcontractors;

11. ARS will evaluate and make recommendations to Client on CCIP safety standards for the Project.

12. ARS will provide safety oversight services, which shall include evaluation of, and making recommendations to Client on, CCIP safety standards for Project subcontractors to include in their safety programs.

13. ARS' loss control personnel shall visit the Project site(s) in the aggregate approximately one (1) day per week to participate in on-site safety meetings with CCIP enrolled subcontractors, and to coordinate meetings between the CCIP insurers and CCIP subcontractors. This is subject to the following:

(a) the total number of hours included in ARS base fee are 832 for the project term with loss control personnel hours used in the enrollment process or CCIP administration not counting toward the total number of hours,

    (b) additional hours are available, at a rate of $150 per hour,

    (c) hours generated in excess of 832 aggregate hours will be approved in advance by the Client and estimated on a quarterly basis.

    (d) excess hours will be invoiced by the 10th of the month following the quarter end and due and payable upon receipt to the Client.

14. ARS will provide CCIP claims administration, advocacy, and consulting services. These services will include development of CCIP claims management and coordination procedures, being a liaison between Client and the CCIP insurers with respect to CCIP claims, provision of quarterly CCIP claims status reports to Client, assisting Client in adjusting and settling claims and losses, and advising Client on coverage application to specific claims.

15. ARS will provide to Client a quarterly stewardship report, which will include:

    (a)    a complete list of insurance coverages in force;

    (b)    an evaluation of the overall CCIP including, but not limited to, program claims and losses, insurance cost savings identified, program savings, and identification of enrolled Subcontractors;

    (c)    a synopsis of financial aspects of the CCIP;

    (d)    a summary of claims administration/loss prevention services provided;

    (e)    recommendations for modifications to services provided;

    (f)    a forecast of market conditions and renewal costs, if applicable;

    (g)    a detailed summary of Fee Compensation and/or Commission Compensation; and

    (h)    commentary on any other developments or issues important to Client.

16. ARS will maintain its records with respect to Client's CCIP in accordance with ARS' record keeping requirements.

Client will receive a complete description of any compensation earned by any Aon entity on your account from any insurers or vendors via multiple forms of written disclosures. This includes statements in our fee agreements and other quote disclosure documents. Aon accepts no bonuses or contingencies of any kind from insurance companies or vendors.

Any form of consideration we may receive as a result of placing your business will be disclosed in advance of any such placement in writing in keeping with our corporate transparency policies.

As noted above we fully disclose any and all income earned from any sources prior to entering into a fee agreement or placing any coverage subsequent to a fee or commission agreement being executed. Additionally, effective October 1, 2004, ARS stopped earning contingent commissions. In placing, renewing, consulting on or servicing any insurance policy – ARS will not directly or indirectly accept from or request of any insurer any contingent compensation. Contingent compensation is any compensation contingent on ARS':

a) placing a particular number of policies or dollar value of premium with the insurer;

b) achieving a particular level of growth in the number of policies placed or dollar value of premium with the insurer;

c) meeting a particular rate of retention or renewal of policies in force with the insurer;

d) placing or keeping sufficient insurance business with the insurer to achieve a particular loss ratio or any other measure of profitability;

e) providing preferential treatment in the placement process, including but not limited to the giving of last looks, right of refusal, or limiting the number of quotes sought from insurers for insurance placement; or

f) obtaining anything else of material value from the insurer.

It is Aon's Corporate Policy to provide a complete Quote Disclosure Report detailing the insurance carriers approached by line of business, the use of any intermediaries, all commissions earned by Aon or any owned or non-owned intermediaries, and the insurance carriers quote or responses, including declinations. It is our Corporate Policy to provide complete copies of all carrier quotations in the original format.

This Agreement contains a comprehensive scope of services assuring we have a clear mutual understanding of our deliveries.